UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRIAN SPEAR & AMANDA SPEAR**, <br><br> Plaintiffs, <br><br> vs. <br><br> **ATRIUM MEDICAL CORPORATION; GETINGE AB; MAQUET CARDIOVASCULAR US SALES, LLC**, <br><br> Defendants. | Case No.: <br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Brian Spear and Amanda Spear, by and through the undersigned counsel, allege as follows:

## INTRODUCTION

1. This case involves a synthetic mesh medical device, known as ProLoop polypropylene mesh ("ProLoop"), manufactured, promoted, marketed, distributed and sold by Defendants for use in hernia repair.

2. The ProLoop mesh is a non-absorbable surgical mesh constructed of monofilaments of polypropylene.

3. Defendants misrepresented that ProLoop is a safe and effective medical device for hernia repair. In fact, ProLoop causes a litany of serious medical problems and complications, including, but not limited to, mesh shrinkage, deformation, material degradation, foreign body reaction, chronic inflammation, mesh infection, migration, organ damage, nerve damage, chronic pain and sexual dysfunction.

4. Although most medical devices, including mesh devices used for hernia repair, are "cleared" for marketing by the FDA under the 510(k) process of the Federal Food, Drug and Cosmetic Act, Defendants manufactured and marketed the ProLoop without clearance from the FDA.

5. Plaintiffs bring this action to recover damages for injuries resulting from the strict liability, failure to warn, negligence, negligent misrepresentation, and breach of implied and express warranties by Defendants in the manufacture, promotion, marketing, distribution and sale of ProLoop polypropylene mesh.

## PARTIES

6. Plaintiff Brian Spear ("Plaintiff") and Amanda Spear ("Spouse Plaintiff") are residents of the Commonwealth of Pennsylvania.

7. Defendant Getinge AB ("Getinge") is a Swedish corporation doing business in the United States. Getinge is a pharmaceutical company involved in the research, development, testing, manufacture, production, distribution, marketing, promotion and/or sale of medical devices used for hernia repair, including ProLoop polypropylene mesh.

8. Defendant Atrium Medical Corporation ("Atrium") is a Delaware corporation headquartered in New Hampshire. Atrium is a wholly-owned subsidiary of Getinge. Atrium is a medical device company involved in the research, development, testing, manufacture, production, distribution, marketing, promotion and/or sale of medical devices used for hernia repair, including – at all times relevant hereto – ProLoop polypropylene mesh. In 2011, Atrium was acquired by Getinge in a transaction which involved, *inter alia*, the transfer of all Atrium's assets and liabilities to Getinge. Following Getinge's acquisition of Atrium, Getinge controls the activities of Atrium and is the direct employer of the individuals formerly employed by Atrium.

9. Defendant Maquet Cardiovascular US Sales, LLC ("Maquet") is a Delaware corporation headquartered at 45 Barbour Pond Drive, Wayne, New Jersey. Maquet Cardiovascular is a pharmaceutical company involved in the research, development, testing, manufacture, production, distribution, marketing, promotion and/or sale of medical devices used for hernia repair, including – at all times relevant hereto – ProLoop polypropylene mesh. Maquet is a wholly owned subsidiary of Getinge and is the exclusive distributor of all surgical mesh products manufactured by Defendants. Upon information and belief, all of the members of Maquet are citizens of states other than the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1332. Plaintiff is a citizen of a state different from Defendants and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

11. This Court has personal jurisdiction over each Defendant because each Defendant purposefully directed its marketing, sales and distribution of numerous pharmaceutical and/or healthcare products to Pennsylvania. Each defendant has substantial contacts with Pennsylvania such that maintenance of this action is consistent with traditional notions of fair play and substantial justice.

12. Venue is proper in this Court pursuant to 28 U.S.C. section 1391(b). Each Defendant is a resident of this district, does business in this district, is subject to personal jurisdiction in this district, and a substantial part of the events giving rise to the claims set forth in this Complaint occurred in this district.

## FACTUAL BACKGROUND

### POLYPROPYLENE MESH

13. Hernia, a condition affecting thousands of men and women in the United States each year, is the protrusion or projection of an organ or tissue through the wall that normally contains it. Although a hernia may form in any part of the abdominal wall, the most common site is the groin. Groin hernias are known as inguinal or femoral, depending on the location of the hernia.

14. Until 1958, abdominal wall hernias were repaired without mesh. In 1958, Dr. Frances Usher published a medical journal article entitled *Marlex mesh, a new plastic mesh for replacing tissue defects*. Dr. Usher used polypropylene mesh in experimental canine work for abdominal repair. Polypropylene is a petroleum-based plastic initially used in the Hula-Hoop and for kitchen storage applications.

15. Heavily promoted by the medical device manufacturers, including Defendants, hernia mesh, typically made wholly or partly of polypropylene, is commonly used in hernia repair surgery.

16. It has been known since 1953 that any implanted device must not be physically modified by tissue fluids, be chemically inert, not incite an inflammatory or foreign body cell reaction, be non-carcinogenic, not produce allergic reactions, and be able to withstand mechanical stress. D. Ostergard, *Degradation, Infection and Heat Effects on Polypropylene Mesh for Pelvic Implantation: What Was Known and When it Was Known*, 22 INT'L UROGYNECOLOGY J. 771-774 (2011).

17. Polypropylene is not biologically inert in the human body, and can cause serious injury to patients, significantly impacting their quality of life. As one author stated, "[p]rosthetic meshes are … not the inert materials they are claimed to be and can expand as well as shrink." A. Coda, *Structural Alterations of Prosthetic Meshes in Humans*, 7 HERNIA 29-34 (2003).

18. A typical response to mesh implanted in the human body is inflammation, granuloma formation and a foreign body reaction. Scar tissue forms around the implant and causes contraction of the mesh up to 50%. This inflammation, foreign body response and scar tissue formation is a permanent condition and can result in long-term complications. U. Klinge et al., *Foreign Body Reaction to Meshes Used for the Repair of Abdominal Wall Hernias,* 165 EUR. J. SURGERY 665-73 (1999).

19. Despite the promotion of mesh as safe and effective by Defendants, the published medical literature contradicts this unsupported belief. One author observed that "[t]he literature suggests otherwise with reports of various degrees of degradation, including depolymerization, cross-linking, oxidative degradation by free radicals, additive leaching, hydrolysis, stress cracking and mesh shrinkage along with infection, chronic inflammation and the stimulation of sclerosis." The author concluded, "Based on available evidence the polypropylene used for surgical treatment of various structural defects is not inert after implantation in the human body." G. Sternschuss et al., *Postimplantation Alterations of Polypropylene in the Human*, 188 J. UROL. 27-32 (2012). As the mesh degrades in the human body, small flakes of polypropylene can lead to infection and irritation, and resultant serious pain, as the body tries to rid itself of the foreign material.

20. Once implanted, mesh contracts as well as cracks substantially in the human body. In one study, a contracture rate of 30% to 50% was found four weeks after implantation. Another study reported an 85% contracture rate after eight years. Nerve fibers are entrapped in the contracted tissue causing severe pain.

21. A debilitating consequence of hernia repair with mesh is inguinodynia, or chronic groin pain. This condition results from nerves, such as the ilioinguinal, iliohypogastric and genitofemoral nerves, coming into contact with mesh, after its degradation and deformation in the body following implantation, and from the persistent and permanent foreign body reaction to the implantation of mesh. It has been reported that hernia repair with mesh results in an extraordinarily high rate of inguinodynia – in some reports approaching 50%. *See, e.g.*, J.E. Fischer, *Hernia Repair: Why Do We Continue to Perform Mesh Repair in the Face of Human Toll of Inguinodynia?* 206 AMER. J. SURG. 619-23 (2013).

22. Other studies have found an even higher rate of chronic pain after hernia repair with mesh. One study found that approximately 75% of patients had pain one year after hernia repair at rest, and 78% had pain when moving. B. Page, *Pain from Primary Inguinal Hernia and the Effect of Repair on Pain,* 89 BRIT. J. SURG. 1315-18 (2002).

<u>DEFENDANTS' PROLOOP MESH</u>

23. On December 16, 1993 Atrium received notification from the FDA that the 510(k) submission for Atrium Polypropylene Monofilament Mesh had been approved, finding the device to be substantially equivalent to a pre-MDA device or another device which had been granted clearance under 510(k). The granted clearance (K930669) applied to the product the specifications of which had been transmitted to the FDA for review, namely a flat, low-profile polypropylene monofilament surgical mesh which was later commercialized under the trade name ProLite.

24. In February of 2001, nearly eight years after Atrium submitted its flat mesh product specifications which were cleared as K930669, Atrium applied for patent protection for a

new invention named "Pile Mesh Prosthesis."[1] This is the pile textile which was later launched and marketed under the trade name ProLoop.

25. ProLoop is a "plug-style" knitted pile prosthetic with radially projecting looping filaments, intended primarily for repair of inguinal hernias.

26. Atrium's patent application, which was ultimately granted on August 31, 2004, sets forth numerous ways in which the product differs in structure and function from flat monofilament meshes such as ProLite. In comparison to such products, the ProLoop design was represented as providing:

> more structural contact filling of a tissue hole or defect, with a more open and resilient 3-dimensional Structure that enables quick healing, with a lower density and resultant tissue encapsulation.[2]

27. Additionally, the ProLoop design is differentiated from designs such as ProLite (K930669) in that the:

> pile mesh construction can fit into an irregularly shaped tissue hole or defect and completely fill the area as a material plug, with significantly less material mass than a traditional flat mesh fabric or patch.[3]

28. Despite the obvious differences in structure, function, and indication, Atrium launched ProLoop in 2001 without obtaining 510(k) clearance on the novel design. Instead, Atrium simply represented to customers and regulatory authorities that ProLoop had been cleared as part of the 510(k) decision for ProLite from 1993 and used the same clearance number (K930669).

29. In 2015, following Getinge's acquisition of Atrium, Getinge submitted a 510(k) application for a number of products, including ProLoop, under the guise of a change of product

---

[1] See United States Patent: Amara et al.; US 6,783,554 B2; Aug. 31, 2004
[2] Id.
[3] Id.

trade names. The claimed predicate device for the "ProLoop Mesh Plug" was the "Atrium ProLoop<sup>tm</sup> Mesh Plug." In this submission, Getinge represented that ProLoop had been cleared under K930669, claiming – in essence – that ProLoop was reviewed and cleared for marketing eight years before it was invented.[4] To date, ProLoop's design has not been subjected to the regulatory processes which are required in order to legally sell such products and which are meant to protect patients from unsafe medical devices.

30. As such, the ProLoop is *per se* adulterated within the meaning of 21 U.S.C. § 351 and misbranded within the meaning of 21 U.S.C. § 352(o) the Food Drug and Cosmetic Act.

31. A plug prosthetic is designed to accommodate high-volume surgical practices by facilitating hernia repair by "plugging" a defect in the abdominal wall rather than reapproximating and reinforcing the patient's native tissues, thereby prioritizing speed of implant over long-term performance and safety.

32. The ProLoop contains a number of design elements which render the product unreasonably dangerous to the patient, including but not limited to the following:

   a. The looped filaments of the ProLoop, which are directly in contact with the walls of the hernia tract, reduce to extremely close proximity as they near the nexus of the loop to the ProLoop's central structural body, raising the risk of mesh contracture and meshoma;

   b. The product lacks bridging filaments between the loops, preventing uniform biomaterial incorporation and raising the risk of mesh contracture and meshoma;

   c. The product contains an unreasonably high volume of non-asborbable synthetic polypropylene material, increasing the magnitude of the host inflammatory response and – as a result – the risk of chronic pain, the risk and rate of harmful polypropylene degradation.

---

[4] See 510(k) Summary; K151437, submitted May 28, 2015;
https://www.accessdata.fda.gov/cdrh_docs/pdf15/K151437.pdf

33.     While it is typical for polypropylene used in medical applications to contain anti-oxidant additives to prevent oxidative degradation *in vivo*, ProLoop is constructed from polypropylene which completely lacks such anti-oxidants, making it unreasonably susceptible to oxidative degradation.

34.     Atrium was aware that its chosen polypropylene lacked anti-oxidants when it elected to move forward manufacturing ProLoop with said polypropylene formulation.

35.     Atrium performed tests demonstrating that such polypropylene formulation oxidized and degraded faster than polypropylene which had been stabilized with anti-oxidant additives.

36.     Degraded polypropylene substantially raises the risk of infection, chronic pain, mesh contracture, meshoma, and mesh migration.

37.     Despite the abundance of scientific and medical information published in the literature relating to the dangerous properties and serious risks of polypropylene mesh, Defendants made a deliberate decision to ignore these dangers and to aggressively promote ProLoop polypropylene mesh to healthcare providers and consumers. Defendants misrepresented and concealed from Plaintiff, Plaintiff's physicians and consumers, the serious risks, dangers and defects enumerated in this Complaint.

## PLAINTIFF FACTUAL ALLEGATIONS

38.     Plaintiff Brian Spear underwent inguinal hernia repair surgery on January 16, 2015 at Abington Surgical Center in Willow Grove, Pennsylvania. During the procedure, Plaintiff's surgeon implanted a ProLoop mesh, catalog number 30901, lot number 212994. The mesh was implanted in a manner consistent with the Defendants' Instructions for Use and in a manner reasonably foreseeable to Defendants. Years after such implantation, Plaintiff suffered a hernia recurrence and the onset of severe groin pain. Plaintiff underwent surgery in which it was discovered that the ProLoop mesh had contracted and become surrounded by a thick mass of scar tissue. Although Plaintiff's surgeon planned to perform a neurectomy to alleviate Plaintiff's pain, the ilioinguinal and iliohypogastric nerves could not be located because of the proliferation of dense scar tissue in Plaintiff's inguinal canal.

39. The hernia mesh implanted in Plaintiff was ProLoop polypropylene mesh manufactured, promoted, marketed, distributed and sold by Defendants.

40. The ProLoop polypropylene mesh caused Plaintiff to suffer permanent injuries, substantial pain and suffering, emotional distress, medical expenses, lost wages and earning capacity, and diminished quality of life.

41. Before Plaintiff underwent hernia repair surgery with ProLoop polypropylene mesh, he had no history of these physical and emotional injuries.

42. Plaintiff files this lawsuit within the applicable limitations period of first suspecting that ProLoop polypropylene mesh caused the harm and injuries suffered by Plaintiff. Plaintiff could not, by the exercise of reasonable diligence, have discovered the wrongful cause of his injuries at an earlier time because the injuries were caused without perceptible trauma or harm, and when the injuries were discovered, their cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, that Plaintiff had been injured, the cause of the injuries, or the wrongful nature of the conduct causing the injuries, until less than the applicable limitations period before the filing of this complaint. Moreover, Plaintiff was prevented from discovering this information sooner because Defendants misrepresented and concealed, and continue to misrepresent and conceal to the public and the medical profession, the dangers of ProLoop polypropylene mesh, as well as the true facts that could have led Plaintiff to discover a cause of action against Defendants for their wrongful conduct.

## FIRST CAUSE OF ACTION
## STRICT LIABILITY-DESIGN DEFECT

43. Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

44. Defendants designed, manufactured, distributed, promoted, marketed and sold the ProLoop polypropylene mesh and it was expected to reach, and did reach, physicians and consumers, including Plaintiff, without substantial change in the condition in which it was sold.

45. The ProLoop polypropylene mesh manufactured, distributed, promoted, marketed and sold by Defendants was defective and dangerous at the time it was placed in the stream of commerce. Such defects included, but are not limited to, defects in manufacture, defects in design, and inadequate warnings and/or instructions that failed to inform Plaintiff and his physicians of the dangers associated with the use of ProLoop polypropylene mesh, as described in this Complaint, and withheld and concealed those dangers from Plaintiff and his physicians. Defendants knew or should have known of the substantial dangers of ProLoop polypropylene mesh as well as the defective nature of the device when used for hernia repair.

46. The ProLoop polypropylene mesh manufactured, sold, distributed and promoted by Defendants was defective due to inadequate post-marketing warnings and/or instructions because, after Defendants knew or should have known of the risk of serious bodily harm from the use of ProLoop polypropylene mesh, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

47. Plaintiff and his physicians used the ProLoop polypropylene mesh as directed for its intended purpose in hernia repair. Defendants knew that the device would be used by consumers, such as Plaintiff, without inspection for defects, and Plaintiff and his physicians did not know, and had no reason to know, of the existence of the above defects.

48. The ProLoop polypropylene mesh was not altered or modified in any way before it was implanted in Plaintiff.

49. As a direct and proximate result of the above defects and substantial dangers in the ProLoop polypropylene mesh, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss, and will continue to suffer such harm, damages and losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, interest, attorneys' fees, costs of suit, and such further relief as the Court deems equitable and just.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY – FAILURE TO WARN

50. Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein and additionally or in the alternative, if same be necessary, allege as follows:

51. Defendant manufactured, designed, marketed, sold and/or otherwise placed into the stream of commerce their ProLoop surgical mesh product.

52. The Defendants failed to properly and adequately warn and instruct Plaintiff and his treating physician that ProLoop was designed and/or manufactured in a way that could cause injuries and damages including lasting and permanent injuries. Defendants further failed to inform and further warn Plaintiff and his treating physician with respect to the most effective proper technique and methods of implantation and/or the selection of appropriate candidates to receive ProLoop.

53. The Defendants failed to properly and adequately warn and instruct Plaintiff and his treating physician as to the risks and benefits of the Defendants' ProLoop. To the contrary, Defendants withheld information from Plaintiff and his treating physician regarding the true risks as relates to the materials and construction of the ProLoop.

54. The Defendants failed to properly and adequately warn and instruct Plaintiff and his treating physician that inadequate research and testing of the ProLoop was done prior to ProLoop being placed on the market and in the stream of commerce and that Defendants lacked a safe, effective procedure for removal of the ProLoop once complications from same arise.

55. The Defendant intentionally, recklessly, and maliciously misrepresented the efficacy, safety, risks, and benefits of ProLoop, understating the risks and exaggerating the benefits in order to advance its own financial interest, with wanton and willful disregard for the rights, safety and health of Plaintiff.

56. As a direct and proximate result of the Defendants' design, manufacture, marketing, sale, and distribution of the ProLoop, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

57. The dangerous and defective conditions in the ProLoop existed at the time it was delivered by the manufacturer to the distributor. At the time Plaintiff had his hernia repair surgery, the ProLoop was in the same condition as when manufactured, distributed and sold.

58. Plaintiff did not know at the time of surgery that the ProLoop placed during Plaintiff's surgery or at any time prior thereto, of the existence of the defects or dangerous propensities in the ProLoop.

59. As a direct and proximate result of the Defendants' design, manufacture, marketing, sale, and distribution of the ProLoop, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

60. The Defendants are strictly liable in tort to the Plaintiff for their wrongful conduct in failing to properly warn Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, interest, attorneys' fees, costs of suit, and such further relief as the Court deems equitable and just.

## THIRD CAUSE OF ACTION
## NEGLIGENCE

61. Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

62. At all times herein mentioned, Defendants had a duty to exercise reasonable care to manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, prepare for use, sell and adequately warn of the risks and dangers of ProLoop polypropylene mesh.

63. At all times herein mentioned, Defendants negligently, carelessly, recklessly and/or maliciously manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, tested, distributed, marketed, labeled, packaged, prepared for use and sold ProLoop polypropylene mesh, and negligently, carelessly, recklessly and/or maliciously failed to adequately warn of the risks and dangers of ProLoop polypropylene mesh, and to adequately provide post-marketing warnings of such risks and dangers.

64. Despite the fact that Defendants knew or should have known that ProLoop polypropylene mesh caused unreasonable and dangerous risks and complications, and failed to warn of those risks and complications, Defendants continued to market ProLoop polypropylene mesh to consumers including Plaintiff.

65. Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of the failure of Defendants to exercise ordinary care as described above.

66. The negligence of Defendants was a proximate cause of Plaintiff's injuries, harm, economic and non-economic loss which Plaintiff suffered, and will continue to suffer, as described herein.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, interest, attorneys' fees, costs of suit, and such further relief as the Court deems equitable and just.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY

67. Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

68. Before ProLoop polypropylene mesh was implanted in Plaintiff, Defendants impliedly warranted to Plaintiff, and Plaintiff's physicians, that ProLoop polypropylene mesh was of merchantable quality, adequately contained, packaged and labeled, and safe and fit for the use in hernia repair.

69. Plaintiff was and is inexperienced in the research, design, manufacture, sale and distribution of medical devices such as ProLoop polypropylene mesh, and reasonably relied upon the skill, judgment and implied warranty of the Defendants in undergoing hernia repair surgery with ProLoop polypropylene mesh.

70. ProLoop polypropylene mesh was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, since it causes serious medical problems and complications when used as intended and will cause injury to consumers who undergo hernia repair with ProLoop polypropylene mesh.

71. As a result of the breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as herein alleged.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, interest, attorneys' fees, costs of suit, and such further relief as the Court deems equitable and just.

## FIFTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

72. Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

73. At all times herein mentioned, Defendants expressly represented and warranted to Plaintiff and Plaintiff's physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, healthcare providers, medical patients and the general public, that ProLoop polypropylene mesh is safe, effective, fit and proper for its intended use in hernia repair.

74. In implanting ProLoop polypropylene mesh for hernia repair, Plaintiff relied on the skill, judgment, representations and foregoing express warranties of Defendants. These warranties and representations were false in that ProLoop polypropylene mesh is unsafe, unfit and ineffective for its intended purpose in hernia repair as described in this Complaint.

75. As a result of the breach of express warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, interest, attorneys' fees, costs of suit, and such further relief as the Court deems equitable and just.

## SIXTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

76. Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

77. From the time ProLoop polypropylene mesh was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians and the general public, including but

not limited to the misrepresentation that ProLoop polypropylene mesh was safe, fit and effective for use in hernia repair. At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of ProLoop polypropylene mesh and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the health dangers and consequences of the use of ProLoop polypropylene mesh in hernia repair.

78. The Defendants made the foregoing representations without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance, and the purchase and use of ProLoop polypropylene mesh for hernia repair.

79. The representations by the Defendants were in fact false, in that ProLoop polypropylene mesh is not safe, fit or effective for use in hernia repair, using ProLoop polypropylene mesh is hazardous to health, and ProLoop polypropylene mesh has a serious propensity to cause injuries to consumers, including but not limited to the injuries suffered by Plaintiff.

80. The above representations by Defendants were made with the intention of inducing reliance, and the purchase and use of ProLoop polypropylene mesh for hernia repair by Plaintiff.

81. In reliance on the misrepresentations by the Defendants, Plaintiff was induced to use ProLoop polypropylene mesh for hernia repair. If Plaintiff had known the true facts and the facts concealed by Defendants, Plaintiff would not have use ProLoop polypropylene mesh. The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and carried out by individuals and entities that were in a position to know the true facts.

82. As a result of the above negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, interest, attorneys' fees, costs of suit, and such further relief as the Court deems equitable and just.

## SEVENTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

83. Plaintiff Amanda Spear ("Spouse Plaintiff") incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

84. Spouse Plaintiff is currently, and has been at all times relevant hereto, married to Plaintiff.

85. A result of the wrongful and negligent acts of the Defendants, and each of them, the Spouse Plaintiff was caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, affection, assistance, and conjugal fellowship, all to the detriment of their marital relationship.

86. That all the injuries and damages were caused solely and proximately by the wrongful conduct of the Defendants.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory damages, interest, attorneys' fees, costs of suit, and such further relief as the Court deems equitable and just.

## PUNITIVE DAMAGES ALLEGATIONS

87. Plaintiffs incorporate by reference herein all of the allegations in this Complaint as if fully set forth herein.

88. The acts, conduct and concealment of Defendants, as alleged in this Complaint, were willful, malicious, oppressive and fraudulent. Defendants committed these acts with a

conscious disregard for the rights and safety of Plaintiff and other consumers, and for the primary purpose of increasing Defendants' profits from the distribution and sale of ProLoop polypropylene mesh. Defendants' outrageous and unconscionable conduct warrants the imposition of punitive damages against Defendants in an amount appropriate to punish and deter such conduct in the future.

89. Before the manufacture, promotion, distribution and sale of ProLoop polypropylene mesh to Plaintiff, Defendants knew that it was in a defective condition, and knew that they had made a strategic decision to fraudulently represent and intentionally conceal the significant risks and serious dangers of ProLoop polypropylene mesh, as described in this Complaint, and knew that consumers who used ProLoop polypropylene mesh for hernia repair would, and did, experience severe physical, mental and emotional injuries. Further, Defendants, through their officers, directors, managers and agents, knew that ProLoop polypropylene mesh presented a substantial and unreasonable risk of harm to the public, including Plaintiff. Thus, Defendants unreasonably, maliciously, oppressively and fraudulently subjected consumers of ProLoop polypropylene mesh, including Plaintiff, to the risk of serious injury.

90. Despite their knowledge, Defendants, acting through their officers, directors and managing agents for the purpose of enhancing the profits of Defendants, knowingly and deliberately failed to remedy the known defects in ProLoop polypropylene mesh and failed to warn the public, including Plaintiff, of the serious risk of injury caused by the defects in ProLoop polypropylene mesh. Defendants and their officers, directors and managing agents, intentionally proceeded with the manufacture, sale, distribution and marketing of ProLoop polypropylene mesh knowing these actions would expose consumers, including Plaintiff, to serious danger in order to advance Defendants' financial interests and increase revenue.

91. Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people and was carried on by Defendants with

willful and conscious disregard for the rights and safety of Plaintiff and other consumers, thereby entitling Plaintiff to the imposition of punitive damages.

**WHEREFORE**, Plaintiffs pray for judgment against the Defendants, as follows:

1. General damages, according to proof;

2. Special damages, according to proof;

3. Loss of earnings and earning capacity, according to proof;

4. Medical expenses, past and future, according to proof;

5. Mental and emotional distress, past and future, according to proof;

6. Punitive damages, according to proof;

7. Costs of suit herein;

8. Pre-judgment and post-judgment interest, as provided by law; and

9. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all counts and as to all issues.

Dated: March 8, 2022                              Respectfully submitted,

                                                  BROWN, LLC

                                                  By: s/ Jason T. Brown
                                                  Jason T. Brown
                                                  111 Town Square Place, Ste 400
                                                  Jersey City, NJ 07310
                                                  Office: (877) 561-0000
                                                  Fax: (855) 582-5297
                                                  *Attorneys for the Plaintiffs*